Hang on for just a second. We'll put you out of your misery in about 20 minutes. Okay. Good morning. Good morning. May it please the Court, I'm Gregory Hughes for Planet Probe. I'm pinch-hitting here for Mike Nakagawa, the trial counsel. He is now a bankruptcy judge in Nevada, so he could not be here. We probably had something to do with that. I think someone on the Court did. Yes. The appellate process... By the way, he's a terrific person, and we're glad to have him in the bankruptcy system. Go ahead. The appellate process here is a little tricky because ultimately what's being reviewed are the rulings of the bankruptcy court. The district court's decisions are the procedural framework because we had to file an appeal from those decisions. But substantively, there is no deference given to the decision of the district court, which means that this Court is going to be reviewing the decisions of Judge Klein. It also means that the standard of review, clearly erroneous or abuse of discretion, applies to the decisions of the bankruptcy court, not the district court. Let me ask you a couple of practical questions. Sure. What's the status of the bankruptcy now? The plan has been confirmed, right? It's been confirmed. Have payments been made to creditors? Payments have been made. It's been completely implemented. There is no reason for the case to be open any longer except for this appeal and ultimately the question of how Mr. Sarma's claim is going to be reviewed. Well, let's assume for the moment that the – let's take the plan off the table and assume for the moment that the adversary proceeding goes forward. At the conclusion of that, if any money is awarded, how does that play into the plan? The plan provides that Mr. Sarma's claim, whatever the amount is, will be paid. It will be paid in full with interest over 36 months. So we're arguing that he has no standard. Yes. Let me back up. Procedurally, we filed a motion to dismiss the plan issues, dismiss the appeal as to the plan, because Mr. Sarma lacks standing. He is not aggrieved because he is to be paid in full under the terms of the plan. Are there any other creditors that are in his position under the plan where there is a – the amount to be paid is undetermined? No. Okay. And are payments being made to the other creditors on the plan? Payments have long since been made. So this is the only outstanding issue? Yes. Okay. And do I understand correctly that after failing to prevail in bankruptcy court that Mr. Sarma did not seek a stay? My understanding is that he sought a stay from the district court before seeking a stay from the bankruptcy court, and the district court properly said, wait a minute, you have to go back to the bankruptcy court. What happened after that with respect to a stay? The bankruptcy court denied a stay in March of 2004. Did Sarma then go to district court? Yes, in September. And was denied? And it was denied essentially as part of the district court's rulings on the merits of everything. Okay. Let me ask another follow-up question following Judge Thomas's train of thought. If, speaking hypothetically now, can the plan be undone in the Senate? In other words, well, you can ask, how many creditors are there? Is it a big group that were paid cash? It's not a large group. It was, I think, fewer than 10, but they have been paid in full. Now, can't they be asked to return the money? I suppose Planet Pro could ask that they return the money, but there's no legal basis for doing it. Well, let's assume there were a legal basis. Then I suppose you might have collection problems, too, huh? Well, but the only way to undo the plan then is to go to the 10 or so creditors who have been paid, paid in cash, and ask them, well, the court has undone the plan, so we have to ask you all to return your dividend or whatever they are, right? And ask them to do that, and they might do it and they might not. That's right. And there would be no way of enforcing that. Well, what creditors are we talking about? These unsecured creditors? These unsecured creditors. And they were paid 100 percent? Yes. And the modification was they were paid over time as opposed to in cash or something? Well, when you say modification, that they were paid over time.  And the time has elapsed. Is that it? Correct. What happened was PlanetPro has done exactly what it was supposed to do under its Chapter 11 plan. It paid its creditors. So no class was impaired? Oh, no. There were impaired. Well, what were the impaired classes? The general unsecured creditors were impaired because they were paid over time. Okay. Other than that. That was the impairment. And the secured creditors? I don't believe there were any secured creditors. I see. So the creditors that were, you know, paid whatever they were paid out of the plan were just ordinary creditors, you know, suppliers or landlords, people like that? Or past employees. Okay. All right. Thank you. And over what period of time were they paid? I believe the payments were supposed to be made over a period of one year and two years, depending on which class. And I believe most, if not all, were paid over a period of about one year. And so Mr. Sarma was to be paid over a period of three years, did you say? If he has a claim. Yes, if he has a claim. But if his status was the same as some other employees, why would the plan provide that he would be paid over a longer period of time? Do you know? I don't know what went into the minds of the people who put together the plan. All I can tell you is what it provides. He was put into a separate class, and the plan provides for payment over three years. I think possibly, and I'm speculating, but possibly the amount of his hypothetical claim was large enough that it would take a substantial period of time to pay him  off. The other creditors had smaller claims, and it was easier to work them into the cash flow equation. So wouldn't he have standing to argue about the length of time in which he was supposed to be paid? It's pretty weak, because in bankruptcy, interest allows for equating present value with major payments. Right. And if you are receiving interest, then being paid over time is the same as interest. Sure. But I think that doesn't, that would not impair standing to make that argument, would it? I mean, otherwise, you'd say if you don't have any creditors that are unimpaired or impaired, no one would have standing to argue about the plan, right? I mean, that's a requirement of confirmation. Right. Well, that you either be unimpaired or you give them the indubitable equivalent or whatever. Right. It just seems to us that where the plan provides for him to receive everything that he's entitled to receive, he's not aggrieved by the plan. And if a party is not aggrieved by the plan, then he doesn't have standing to appeal  It's a relatively minor point, because we also have the equitable mootness argument and the constitutional mootness argument. Equitable mootness is a doctrine which allows the court to dismiss an appeal where there has been a comprehensive change in circumstances such that it would be inequitable to consider the merits of the appeal. This plan has been completely implemented to the point where it just wouldn't be right to overturn it. We would be in the position of trying to unscramble an egg. The only loose end is the payment of Mr. Sarma. What would happen if we were to overturn Judge Klein's order? What would happen then? What would be the next step? I don't know. You don't know. I can't imagine how we'd go back into the bankruptcy court and say we have a plan that's been overturned, it's been completely consummated, completely implemented, carried out. No, I don't mean that. You know, I mean the order dismissing the adversary. In that case, we go back to bankruptcy court and just depending on the ruling, we just resolve that claim on the merits, right? Yes. So that's the only way to resolve the case. So you would have to do that proceeding. You would either try it or settle it, and then, you know, and then the rest of the plan would take effect. Well, then it gets paid under the terms of the plan, which is it paid out under three years. So then I think we've been attacking this appeal kind of, you know, from the tail  Now, the reason there was an appeal to the district court was because the adversary claim was dismissed, right? Correct. Now, did Judge Klein give a reason why he thought that was the appropriate sanction for the infraction? Well, it wasn't a sanction. And the transcript shows that. Well, I think he knew, everybody knew that was coming, right? But even so, I think it's an error to speak of this as a sanction. It's an evidentiary situation. The local rule and the trial order. Well, you know, to me it's just like, you know, a judge granting a motion to suppress in a criminal case against the key evidence that the prosecution has. And everybody knows darn well that if you suppress that evidence, there's nothing left of the case. That's true with your situation, isn't it? Yes. Yes. But I'm just quibbling with the word sanction. Well, it wasn't labeled a sanction. It doesn't meet the sanction. But in fact, Judge Klein had the discretion to either say yes or no. Yes. And he decided to strictly apply the rule, which under the circumstances resulted in a sanction-like result. It resulted in the dismissal of the adversary proceeding. Yes. And everybody knew that that was the inevitable result of it, right? Well, it occurred within the time. Without any evidence. It occurred over a period of about a minute. So my question is, how did Judge Klein, you know, explain or rationalize his ruling? All right. The rationale was that the pretrial order provided that declarations and evidence had to be submitted and furnished to the other side 10 court days prior to the trial date. And Mr. Nakagawa, in turn, had to submit his declarations and evidence 5 court days prior to the trial date. Counsel for plaintiff did not comply with that rule. And he missed it by 6 days. And when all was said and done, Judge Klein had to figure out what is the remedy for this. Well, but before you get to the remedy now, okay, so he missed that deadline, but then wasn't the schedule adjusted in the sense that you got more time to do your stuff and, you know, people were given more time, right? Well, there was an adjustment made. But even so, Mr. Nakagawa didn't have the full period of time that he was entitled to. But there was no argument of prejudice after that. I don't know that it ever got to the point of arguing prejudice. The problem at that point was? Well, the problem is what are the appropriate consequences when a plaintiff misses his deadline? You can strike the declarations, but what are the other alternatives? Well, continue the trial date? What you do? I mean, it's a local rule, though, which makes it a little bit different. I mean, it's let me ask you this. I'll ask you this. It's a bit off the record, but I just appreciate it. Is this a let me put it this way. In your view, does Judge Klein consistently apply this rule and strictly or do you think he made a difference in this case? Oh, no. He applies it strictly and at every pretrial conference where he sets a trial, he says we're going to follow Rule 9017-1 and I take it seriously. And when he's setting a trial for a senior judge, he says Judge Ford or Judge Dorian takes this rule very seriously. There's no question that when. So in your view, this was not in response to anything that happened in the bankruptcy, but rather the court's consistent, part of the court's consistent practice? Yes. There's no doubt about that. And I've been practicing in front of Judge Klein for probably 16 years and I have never dared not meet that deadline because I know what the, well, I don't want to find out what the consequences are. Well, practices differ from court to court, but let me ask you this. Why do you think, I mean, when we look at it on appeal, the local rules don't bind us. We're looking at the rules of bankruptcy procedure and this is something that certainly local courts are authorized to do, but it's a little bit different when we look at it in terms of saying, well, if it results in dismissal of your whole action, maybe we ought to say that the bankruptcy rules trump. Well, it's really a question of the court's discretion. And from your viewpoint, you're considering whether Judge Klein abused his discretion in ruling as he did. And enforcing a local rule, yeah. Well, it's not just the local rule, but it's the pretrial order as well. Because the pretrial order, it told counsel to follow the local rule. And the decision of In re Gergly, which we cited in our second brief, it's 110 F. 3rd, 1448, which is a decision of this Court from 1997, is directly on point. The plaintiff in that case failed to submit prior to trial the declarations and exhibits required by the pretrial order. And just as occurred here, the bankruptcy court refused to allow the plaintiff to introduce the evidence he wanted to bring in and that he hadn't presented. And on appeal, this Court said the bankruptcy court did not abuse its discretion. I'm sorry, what case was that? That's In re Gergly, G-E-R-G-E-L-E-Y. Okay. You have about four minutes. You can use it for rebuttal if you like. Yes, I would appreciate reserving the time. Thank you. We'll hear from Mr. Sarmat this time. Good morning, Your Honors. Good morning. May it please the Court. Your Honor, the case started as an H-1B immigrant engineer who was highly talented. Pull your mic down a little bit. Highly talented. The fellow that was in before was about a foot taller than you, so that's right there. Okay. Go right ahead. An immigrant engineer, highly talented computer scientist, science programmer, sought to collect his wages. That's the start of this case. It was in November 2001. When he demanded the wages, the employer says, I will carry, you know, he they withdrew his visa, threatened deportation, and then went to the employer where he was working as a contract engineer, interfered with his work, where he was getting paid $125 an hour. May I ask what your client's status is now? He currently has a green card, Your Honor. After we submitted all the papers in this file to the Labor Department, they actually plotted the way he was trying to enforce the immigration laws, and they expedited these papers and got him a green card. Okay. If we approve what the bankruptcy court did, what happens with your client's claim? Does it go to State court? Bankruptcy court dismissed the adversary proceeding, Your Honor. Therefore, he would, according to the filings by the debtor, Planet Pro, we get zero. He had filed somewhere else before Planet Pro. Where was that filing? That was in San Francisco Superior Court, Your Honor. Okay. He filed his wage claim and other unpaid wages claim there. And then on the day, on the eve of the trial, the case went through the entire litigation process in the Superior Court. March 24, 2003, Monday, was to be the trial date. After numerous extensions, the defendant sought in that case. And on March 21st at 4 p.m., just about 5, 10 minutes before the court closed in Sacramento, they changed the forum, filed a bankruptcy there. There was no reason to file a bankruptcy, no business reason, no cash flow reason. All invented just before, after, on March 10th of that year. Is it your contention the bankruptcy, the reorganization proceeding was filed in bad faith? Of course, Your Honor. Did you raise that issue before Judge Klein? Yes, Your Honor. And what did he do with it? Judge Klein has never ruled on that matter. Judge Klein said we are stuck with the fact of bankruptcy. How much is your client owed? Your Honor, I at the time, we believe he was owed about $100,000 plus in unpaid wages. But then he also lost the high-paying job and he was unemployed for more than a year after that. But hard damages are about $100,000? Hard damages are about $100,000. Does California have a trebling statute? California, I'm not aware of it, Your Honor. There is a California. It might be something to look up. In Arizona, if you fail to pay wages when they're due, you can recover three times the amount. You don't know whether California has such a statute? California statute, Labor Court Section 203, says upon termination of employment within 72 hours, the employee is due all of his wages. And if you don't pay, then there are attorney's fees. There is one month of penalty and other assortment of things. Section 201 and 202 of the Labor Court also come into play when they are not paid on a regular course of business. So assuming there's no trebling statute, your client is owed somewhere in the neighborhood of $100,000 plus fees? Plus fees and the interest over the period of time, as well as other tort claims, related tort claims that he asserted. One of the important tort claims, Your Honor, is that the California does not obey non-compete agreements. And when a company enters into a covenant not to compete and they're unenforceable in California. They threatened to enforce it by going to the employer where he was working and threatened them with a lawsuit and had them discharge Sharma from his job. So they, in fact, threatened this company to enforce a covenant not to compete, which is. It sounds to me like your client, you and your client believe you have a claim that the tort aspect of which exceeds the value of any wages due. Yes, Your Honor. Several times. As a matter of fact, that was. Do I understand correctly under the terms of the plan? Let's say that you take this case back to San Francisco Superior Court and you prevail both on the wages that are due, $100,000, whatever, plus attorney's fees, plus cost, plus you win a judgment based on this disparagement claim, if you will, that whatever the total of that is, they're obligated to pay it under the plan? Your Honor, we believe that the total amount is going to put them back into another bankruptcy. Well, the counsel represented to the Court in his argument that the plan provides that your client is to be paid over time the full amount of whatever he recovers in his claim. Is that your understanding? That's what they claim, Your Honor. But they also suggested in numerous papers that were filed in this Court that they would, again, what happens if they breach that? Well, wait a minute, wait a minute. The plan provides, let's just start off with basics. The plan provides that whatever you recover, you're going to get paid over 3 years. That's what the plan states, right? Yes. Plus interest, right? Yes, Your Honor. Okay. Your concern is they don't have enough money to pay it, but doesn't that defeat your whole notion of this bank? I mean, if you say they're going to be back in bankruptcy, you're basically saying they couldn't pay it now. Your Honor, that is why we proposed a rival reorganization plan. You proposed a plan that would give your client money at the expense of everybody else. Not everybody else, Your Honor. And you did it without authorization. I mean, there are rules about this, about how you propose these kinds of plans. And I can understand why the bankruptcy judge got upset with your – the way you proposed your alternate plan of reorganization, because it provided for a security interest for you. It did not provide for other creditors. You didn't use the proper procedure, at least in my view. So, I mean, I can understand why you'd like it. I mean, it's a – I want to explain that. I don't think it could have been confirmed legally because it impaired other classes. I want to explain that our proposed plan, Your Honor, it was not – we actually proposed to pay off all the existing creditors right up front, on-plan confirmation, 100 percent. So there would be nobody that would have any negative consequences as a result of our plan being confirmed. As well as the – going back to the Honorable Judge's question before, we can actually – we don't even have to worry about recovering the monies that were paid to the – to the plan were to be reversed, because upon – if this Court affirms our plan, our plan basically says they are all paid. They will be paid. So we are not going to go and recover anything from any of these already paid creditors. Did you circulate your plan in violation of Judge Klein's order? No, Your Honor. He says you did. Judge Klein – we circulated a plan. We followed whatever the rules were in the bankruptcy procedure. And I didn't really know which rule was – was supposed to have been violated on our side. One objection that the United States trustee made was that there were only 12 days for the hearing, and therefore, they needed more time. They wanted 15 days, three more days. And I respectfully requested the Court to continue all confirmation issues to one – one particular date, sometime one month later, so that everybody that needed to file a paper would have their opportunity to file a – an objection or whatever paper in that – in that regard. Is it your view – let me switch topics. Is it your view that – I ask this question of imposing counsel. In your experience with Judge Klein, does he uniformly enforce the rules with respect to submission? I – I do not believe so, Your Honor. Judge Klein – I have had several telephonic hearings with Judge Klein. He was extremely patient on one particular occasion. I was on the court call – telephone conference waiting for the Court to call our case. I waited for four hours one day, during which, in order to auction off a used Pontiac Grand Am for $1,000 and $45 – $1,045, the Court spent like an hour and a half auctioning it off. And I – I – I don't think that was Judge Thomas's question. Imposing counsel said that with respect to the submission of witness and exhibit lists attendant to a pretrial order, that his experience in Judge Klein's courtroom is that he routinely, strictly enforces that rule. Well, even – We're not talking about the auctioning of a Pontiac. Okay. We're talking about submitting exhibits and witness lists consistent with the local rule. I – I would explain to you, the Court, by referencing the record in this particular case, even in this particular case, until that objection was raised by the opposing counsel, it was not even deemed an important item for the Court. Was this your first time in bankruptcy court? Yes, Your Honor. Okay. It was the first time, and it was the – I even heard about a bankruptcy. So you don't have any experience in other cases about what Judge Klein does or doesn't do with respect to enforcement of the local rules, right? I have seen Judge Klein in this particular case where – Your experience is limited to this case. This case, Your Honor. You cannot, in good faith, tell the panel that you have experience with Judge Klein in instances in which he has not strictly enforced this particular rule. Correct? I – no, I respectfully disagree with it, because, Your Honor, Judge Klein has struck one of the papers that I filed. Other than this case, do you have any such experience? No, Your Honor. Okay. Other than this case. But I want to conclude the thought, because it's important. One – one paper that I filed, Judge Klein struck it by saying that a certain number called docket control number, which is a serial number, was not there on the front page of the paper. And subsequently, I amended that error, and I refiled it. But at the same time, when I issued some trial subpoenas to the third-party camp star systems, they filed a motion to quash subpoenas. They never had these docket control numbers on it, but the judge did not care about the lack of those things, despite the fact that I raised that matter on a telephonic conference. I said, well, you know, it appears that the – these docket control numbers are very mandatory to this Court. In which case, how is – and, you know, how is this possible? But it appears that these were very laxly enforced, and they were enforced only on a – with an idea of a result-oriented, I would like. Do you have anything else for us? Yes, Your Honor. I would like to – the Court to address the issue of – I want to address the issue of bad faith filing of the Chapter 11, and also from there on. How is that part of this? Pardon me, Your Honor. How is that part of this appeal? It is a part of our cross-appeal, Your Honor, where we requested the Court to take a look at Judge Carlton's order and rule that because it was bad faith filing, that Plano Pro filed on the eve of the trial with sufficient funds in the bank. They had $800,000 in the bank, and they had $120,000 of outstanding debts. And this litigation, when the trial judge in the San Francisco Superior Court indicated that this case might be a multimillion-dollar judgment because they were interfering with his visa status, they – within a few days, the defendant goes and files bankruptcy in this case and gave an excuse that some cash flow problems existed, but there were no cash flow problems anywhere else. Judge Carlton went through the record and identified numerous instances of lack of correspondence between the truth and the allegation, and listed all of them and stated basically that this was not filed in good faith, and it was also filed as a litigation tactic and as an improper – for an improper purpose. In view of that, our argument, Your Honor, is that whether a person who files a bankruptcy as a litigation tactic to thwart a State court claim may even request a – any equitable relief from this Court, whether the – whether this Court should even consider approving or affirming any of the plans or even address any issues of mootness, which are all equitable doctrines, in light of the fact that a certain – the original filing itself was tainted with bad faith. But Judge Carlton sent that back to the bankruptcy judge, right? He made – he made several explicit rulings and sent it back to the bankruptcy court, stating that – So what's wrong with that? Well, the – the – We can't make a bad faith finding here on your – on your bare allegations. Your Honor, the record – extensive record is developed, and based on which, Judge Carlton has gone through the record and the testimony of the parties, the creditors' – record of the creditors' meeting and the reasons given. Everything was there. Okay. Let me ask you this question, then. Let's – let's assume for the moment that you've got a live issue with the plan. It's already been performed. Everybody's been paid. Why isn't this case moot? It's not – With respect to the plan. Well, it is interesting, Your Honor, because first off, the plan itself was a gerrymandered plan. It was not – it did not follow all the aspects of the code. It – it did not account – it had insiders' vote in it. It has unlawful segregation of the creditors into – several of the interested creditors into one class and one – But the plan ultimately provided that all the creditors are going to be paid 100 percent over time, and that you're going to be paid 100 percent over time. What's wrong with that? Well, Your Honor, the – where is the equity in a – in why – why was this particular employee given such a runaround through so many hoops he had to jump? The other three creditors, out of the – the overall number of creditors was barely seven, Your Honor, seven creditors, out of which two were the lawyers who continue to have relationship with this company. Three were employees whose wages were earned and were not paid and withheld in order to create a class of – Do any of – did any of them have a claim even approaching the size of your clients? They were all $20,000, $25,000. All of them combined would be about $100,000-plus, Your Honor. Yeah, but you think your clients owed $100,000-plus attorney's fees, plus maybe a million dollars on the tort claim? That is still to be decided, Your Honor, at the time, in which case we should have been given the idea – the vote, the number of votes in accordance with the estimated number of claims. Furthermore, Your Honor, we have – Here's the problem. You're asserting that it was filed in bad faith because they had the money, but you're telling us today that they don't have the money. They don't have the money to pay your claim. That's what you're saying today. They would file bankruptcy again if you got a judgment in full because they don't have the money. Your Honor, they created the lack of money situation by giving the insiders large bonuses leading up to the bankruptcy. I have clearly disclosed all of that in the appeal that we filed with Judge Carlton from which Judge Carlton made the rulings. Within the 90 days prior to the petition date, the defendants have given the President, the inside officials, and the friends, family, everybody, $25,000, $30,000, $50,000, $80,000 of bonuses, wiped out the bank accounts. Right. And you had a remedy available to you in the bankruptcy to challenge that, and you didn't take it. But Judge Klein would not even listen to us. I raised all these issues, Your Honor. Judge Klein would not. Did you file an adversary proceeding or ask the U.S. attorney to file an adversary proceeding to set aside a preference? Of course, Your Honor. I went repeatedly, called the U.S. trustee and the U.S. attorney's office to say this is a fake bankruptcy. They created this condition. They didn't have any reason. If they had a cash flow problem, you don't pay insiders $50,000, $80,000 bonuses and create an aggravated problem. If they keep paying insiders like this, that is the reason I said if they keep paying the insiders, they would never have the cash. Their business, Your Honor, is they send out an employee out to work in the field, and the employee generates, let us say, $10,000 of billables per month. Until that $10,000 is collected, they would not be paying the employee anything. And once the $10,000 is collected, they promise to pay the employee eight of those $10,000, 80 or 90 percent of it, and that is the promise they breached. And they were only paying half of what they promised, $4,500. So this is a cash surplus business to begin with, and this business model is not going to change. So when did they come with the litigation problem? They were routinely, for nearly 50 or 60 employees, they were routinely withholding the monies that were owed to the employees and not paying them the full wages, which one of those 50 employees filed a lawsuit saying I need the money, and this is where we are five years later, Your Honor. This type of, the problem that I envisioned when I looked at this behavior of an employer doing this is that every employer can mimic this strategy. How many immigrants, how many engineers who are working for salaries and living on a visa would have the wherewithal to bring a claim in a court, go through the bankruptcy court, go through all the local rules, file all these papers, and then suddenly one local rule, two days, I still believe that Judge Klein's computation of time was wrong, and gets the whole thing dismissed, and he's gone. The employer will go scot-free under the scenario that is presented by Planet Pro's actions, Your Honor. The court should, I respectfully request the court to affirm Judge Carlton on all grounds and give the remedy that Sarma requested in his briefs. Okay. You've exhausted your time. Thank you for your argument. Rebuttal? Thank you, Your Honor. I want to address a couple of points that the panel raised. There was a reference to the concept of taking the case back to San Francisco. I don't know that that's a viable possibility. The case was initially filed in San Francisco Superior Court and then was removed to the bankruptcy court. Right. But on remand, Judge Klein can decide that maybe the removal was improvident and send it back, right? Because it would still be within, if it's a removed case, you still have an ongoing case. So that's still a possibility, right? Yes. If it goes back, it goes back in front of Judge Klein. In the first instance. In the first instance, yeah. But it wouldn't automatically go back to San Francisco. And that's just a point I wanted to make. Secondly, counsel circulated the plan, his plan and disclosure statement, in violation of Section 1125B of the Bankruptcy Code. It wasn't in violation of a specific order of Judge Klein.  Code. But Judge Klein could have dismissed the hearing on his disclosure statement and plan and sent it out to everybody before it had been approved. And that's a mortal sin in the bankruptcy world. Because you can't send your disclosure statement out until after it's been approved. Right. But I think I was referring to the general order that would come out in any bankruptcy that's setting the deadline for filing a disclosure statement. Right. I mean, of course, you have the statute, but don't you, on the initial notice, I assume that there's an order that says this is the date for filing. Typically, no. There are no dates set for filing of a disclosure statement or plan, except by the debtor. The court will hold the debtor's feet to the fire and say you've got to have a plan on file by such and such a date. But that is not a date that creditors are required to live with. However, if a creditor wants to have a plan considered, either at the same time as the debtor's plan or prior to the debtor's plan, they've got to get it on file. And if they don't get it on file by the time that the debtor's plan is moving forward, the court is not required to slow down the debtor's plan in order to allow them both to go on the same track. These two plans were on different tracks. And the debtor's plan got confirmed before anybody ever got to the point of considering the merits of the debtor's plan. And, of course, you can only have one confirmed plan in a case. Well, distilled to its essence, what Mr. Sorum was claiming is that you conjured up this whole bankruptcy in order to forward his claim. What's your response to that? Our response is to go back and look at his motion and the transcript of the hearing on that motion. We never filed any responsive pleadings to his motion because he did it on short time. It was filed and then it came up for hearing under the courts, under the local rule, a different local rule that says that you can set a matter on 14 days' notice and if a party opposes it, all they have to do is show up. And typically, a briefing schedule is set. And Mr. Nakagawa walked into the hearing on April 9, 2003, I think it was, and said, I think we need to set a briefing schedule because we're going to oppose the motion to dismiss. And it was combined with a motion for relief from the automatic stay. And what Judge Klein did was he solved the problem, which was that Mr. Sarma wanted to get his case to trial. And so right there in court, he gave the option of removing the case and bringing it to the bankruptcy court because he could get it on, he could do a trial faster than the superior court. And because of that, he then just basically denied the pending motion because it was worked out that the case would come to bankruptcy court and would continue in bankruptcy court. So we never had an opportunity to contest the bad faith allegations. And essentially you would contest them. We would contest them. I wasn't asking what happened. I was asking your substantive response. Your answer is it's not in the record and you'd explain that, but I gather you would contest that. It is in the record of the confirmation hearing. There is a substantial discussion of why the Chapter 11 was filed. Okay. Okay. We can look at that. Thank you. You're over your time. The case just argued will be submitted and I'll call for the last time Lassonde v. Aloha Airlines. Counsel, will you come forward and state your appearance?
judges: Noonan, Hawkins, Thomas